DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
MATTHEW T. MONTGOMERY (Cal. Bar No. 260149)
Email:  montgomerym@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| DAVID SIMS, MARIO PROCOPIO, RALPH C. GREAVES, ALC HOLDINGS, LLC, EL CETHER-ELYOWN, and SIMS EQUITIES, INC., | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendants David Sims ("Sims") and Mario Procopio ("Procopio") reside in this district, and defendants ALC Holdings, LLC ("ALC"), El Cether-Elyown ("ECE"), and SIMS Equities, Inc. ("SIMS Equities") (collectively, "defendant entities") have their principal places of business in this district.

## SUMMARY

4.     Between April 2014 and May 2017, defendants Sims and Procopio, through the defendant entities, raised an estimated $1,410,000 from approximately thirteen different investors in what is commonly referred to as a "prime bank" scheme.  Sims, a recidivist charged by the SEC in a prior prime bank scheme, and Procopio, his partner, lured investors into their scheme by claiming they had access to "trading platforms."  As is typical in these kinds of scheme, they told investors that governments, corporations, and wealthy investors used these trading platforms to buy vast sums of currency (usually $500 million or more) at discounted prices from foreign banks.  Sims and Procopio claimed they could "piggyback" on one of these large trading platforms and reap huge returns with "absolutely no risk."

5.     To make this investment appear legitimate, Sims and Procopio would show investors fictitious balance sheets, bank statements, legal correspondence, and other documents to bolster their claims.  They also had investors sign what they

called "Funding and Participation Agreements," which purported to guarantee investors returns as high as 1,200% and 40,000% on their investments.

6.      In reality, the whole thing was a scam.  The so-called trading platforms do not even exist.  None of the money that Sims and Procopio received from investors was added to any trading platform or ever invested, and none of the investors were paid any returns from a trading platform or any other investment. Instead, Sims and Procopio just took all, or substantially all, of the investors' money and used it to pay for their own personal expenses like cars, rent, jewelry, travel, golf, and food.

7.      Defendant Ralph Greaves ("Greaves"), an attorney licensed to practice law in California, aided and abetted this prime bank scheme.  As a lawyer, Greaves gave the scheme a cloak of legitimacy, by acting as one of the "paymasters" and allowing some investors to deposit their money into his attorney trust account.  The bulk of that money was then transferred into bank accounts controlled by Sims and Procopio.  Greaves was not aware of a single instance when Sims and Procopio had *ever* wired any returns back to investors.  Yet he told investors that Sims and Procopio "have always come through," or words to that effect and that Sims and Procopio had paid returns of "up to 400%."

8.      Acting as an investor in the scheme, an undercover agent ("UC") working for the Federal Bureau of Investigation ("FBI") helped reveal the fraud. Over the course of more than a year, UC secretly recorded in-person meetings and telephone conversations he had with Sims, Procopio, and Greaves.  They can be heard discussing fictitious documents that were given to UC and also making false and misleading statements to UC.

9.      By engaging in this conduct, defendants Sims, Procopio, ALC, ECE, and SIMS Equities each have violated and may be continuing to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act. Defendant Greaves aided and abetted Sims, Procopio, ALC, ECE, and SIMS Equities

COMPLAINT                                    3

in these violations by engaging in this conduct.

10.  The SEC seeks permanent injunctive relief against all defendants and conduct-based injunctions against certain defendants to prevent future violations of the federal securities laws, disgorgement of ill-gotten gains from certain defendants, along with prejudgment interest, and civil penalties from all defendants.

## THE DEFENDANTS

11.  **Defendant David Sims** resides in Costa Mesa, California and is president of defendant SIMS Equities, Inc.  In 1997, the SEC sued Sims for conducting a multi-million dollar fraudulent investment scheme involving fictional trading of securities purportedly issued by major international banks.  *SEC v. Rob Nite, et al.*, Case No. CV97-6546 (Local).  The SEC's complaint alleged that Sims offered astronomical returns on relatively small investments.  Sims consented to the entry of a judgment against him without admitting or denying the allegations in the complaint and was permanently enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

12.  **Defendant Mario Procopio** resides in Newport Beach, California and is not registered with the SEC in any capacity.  Procopio is the sole member of defendant ALC Holdings, LLC and the President of ECE.  Procopio also holds himself out as a religious pastor.

13.  **Defendant Ralph C. Greaves** resides in San Diego, California and is not registered with the SEC in any capacity.  Greaves was admitted to practice law in the State of California on December 22, 1976.  In or about 1998, Greaves was suspended from practicing law for six months and placed on probation for two years after he pleaded no contest to falsifying information on several of his income tax returns.  Greaves is listed as an active attorney by the California State Bar and is the sole practitioner at his law office in San Diego, California.

14.  **Defendant ALC Holdings, LLC** is a limited liability company in

California and was formed on November 18, 2016.  Procopio is listed as the President of ALC, which lists its principal place of business as 120 Tustin Ave., Ste. C-1152, Newport Beach, CA 92663.  ALC is not registered with the SEC in any capacity.

15.     **Defendant Cether-Elyown** is a nonprofit organization in California and was formed on May 11, 2015.  Procopio is listed as the president of ECE, which lists its principal place of business as 120 Tustin Ave., Ste. C-1152, Newport Beach, CA 92663.  ECE is not registered with the SEC in any capacity.

16.     **Defendant SIMS Equities, Inc.** is a corporation in Wyoming and was formed on April 1, 2010.  However, it has been inactive since June 9, 2017.  Sims was listed as the president of SIMS Equities, which listed its principal place of business as 177 Riverside Ave., Ste. F1152, Newport Beach, CA 92663 and used 120 Tustin Ave., #C-1152, Newport Beach, CA 92663 as its business address.  SIMS Equites is not registered with the SEC in any capacity.

## THE FRAUD

### A.     "Prime Bank" Schemes

17.     The SEC and other federal and international authorities have issued warnings and statements to the public explaining that prime bank trading programs are a scam.  On February 15, 2015, the SEC released an Investor Alert to the public titled, "Prime Bank Investments Are a Scam," located at www.sec.gov/oiea/investor-alerts-bulletins/ia_primebankscam.html.  In it, the SEC explained that all prime bank investment programs are fraudulent, and while the term "prime bank" itself may not be used to promote the scheme, such schemes typically have the following hallmarks:

(a)     Prime bank programs often claim that investors' funds will be used to buy and trade supposed prime bank instruments, and that investors will receive guaranteed, high investment returns with little or no risk.

(b)     Promoters of prime bank schemes often make the schemes sound legitimate by using complex, sophisticated, and official-sounding terms.  These terms may include debenture, standby letter of credit, bank guarantee, prime world bank

financial instrument, private funding project, offshore trade or trading program, trading platform, trading facility, trade slot, high-yield trading or roll program, guaranteed bank note, or some variation on these terms.

(c)     Promoters of prime bank schemes often claim that investment opportunities are by invitation only and limited to select, wealthy customers, or will say or imply that these types of investments are the exclusive, "secret way" that wealthy people make all their money.  And they will often cite secrecy if potential investors ask for references, and may ask investors to sign non-disclosure agreements.

(d)     Promoters of prime bank schemes will often hire escrow agents or use escrow accounts to receive and disburse investor money, and falsely claim that investor funds will be kept safe and protected from loss in the escrow or trust account.

18.     As alleged below, the defendants' prime bank scheme largely followed this pattern.

**B.     Defendants' Prime Bank Scheme**

19.     Between April 2014 and May 2017, Sims, Procopio and the defendant entities, with the help of Greaves, carried out their prime bank scheme, raising an estimated $1,410,000 from approximately thirteen different investors located in several states, including California, New York, and Texas.

20.     Generally, and as illustrated by the examples below, Sims and Procopio solicited investors through referrals by friends and associates and would often pitch investments to prospective investors over the telephone.

21.     Sims and Procopio lured investors into their prime bank scheme by making many of the same false and misleading statements to investors that are the hallmarks of prime bank frauds.  They claimed to have access to what they called "trading platforms" and told actual and prospective investors that these trading platforms were used by foreign banks and groups of wealthy investors to buy vast

sums of currency at a discounted price, which were then sold for a profit.

22. Sims and Procopio gave investors phony explanations of how the trading platforms supposedly worked. For example, Sims and Procopio told one investor, on or about November 30, 2016, that buying large sums of money at a discount and then selling it for a profit was authorized at the Bretton Woods Conference held in the 1940s, as a way to rebuild Europe after World War II. Sims and Procopio described the trading platform to this investor as a well-known secret and the way wealthy people made their money.

23. Sims and Procopio told investors that they had access to these trading platforms through their business partner, who they claimed was one of the few people licensed to buy discounted currency (or what they called "paper" and "medium-term bank notes") from Deutsche Bank, HSBC Hong Kong, Credit Suisse Geneva, as well as other banks, and then sell it for a 20 to 30 percent profit.

24. According to Sims and Procopio, vast sums of money were traded on these trading platforms, typically between $500 million to $1 billion at a time, and Sims and Procopio offered investors the opportunity to "piggyback" their money onto one of these massive trades. They described this opportunity as an "investment" and told investors there was absolutely no risk involved.

25. Sims and Procopio led several investors to believe that their money was going to being pooled with other investors' money—either wealthy investors whose money would purchase the currency being traded on the trading platform, or smaller investors whose money would piggyback the trade. They told investors that the returns on their investments would come entirely from Sims and Procopio's business partner's ability to buy and sell the currency on the trading platform for a profit.

26. Sims and Procopio entered into investment contracts with the investors that they called "Funding Participation Agreements." Although the terms of these agreements varied from investor to investor, they typically promised investors an initial "payout" within 30 days that was greater than or equal to the investors' initial

investments.

27. The agreements also promised investors that the initial payouts would be followed by weekly or monthly payments that would last for a fixed number of weeks or months. The returns that investors were promised under these agreements typically ranged from 1,200 percent to 40,000 percent growth in less than a year.

28. Under the agreements, investors did not have any ability to access the "trading platforms"; the investors were relying on Sims and Procopio to generate investment returns.

29. The agreements listed fictitious "transaction codes" to make it appear as though the investments were tied to legitimate banking transactions and required investors to promise—under penalty of perjury—that they would keep the terms of the agreements completely confidential.

30. More than one investor was led to believe that his or her money would be held by someone Sims and Procopio called a "paymaster." That is, someone other than Sims and Procopio, who would accept the investors' funds and, once they were added to the trading platforms, pay back the investors the returns on their investments.

31. Sims and Procopio held Greaves out as one of these paymasters. They described Greaves as one of their attorneys and someone whom they said was licensed to bring vast sums of money, for example $100 million, into the United States from overseas.

32. Sims and Procopio directed investors to deposit funds in the form of checks and wires to one of several accounts, either held in one of their names or in the names of one or more of the defendant entities.

33. Sims and Procopio were the sole signatories on their own and the defendant entities' accounts where investor monies were deposited, and they controlled those accounts.

**C.   Defendants' Material Misrepresentations and Other Deceptive Conduct**

34.   From approximately April 2014 to May 2017, Sims and Procopio made, with Greaves' assistance, material misrepresentations to investors about the fictitious prime bank scheme in order to lure the investors into their scheme.

35.   Sims and Procopio, again with Greaves' help, also obtained hundreds of thousands of dollars of investor money by means of these false statements and omissions.

36.   At least four investors were defrauded by Sims and Procopio in their prime bank investment scheme. They are named herein "Investor A," "Investor B," "Investor C," and "UC."  These four investors were located in various states in the United States.  The following illustrates how each was defrauded and the various means by which Sims and Procopio carried out their fraud:

   **1.   Investor A**

37.   On or about July 28, 2014, Sims sent Investor A an email offering him the opportunity to invest up to $140,000 in a $925 million trade platform, which Sims claimed would be "paying out" on August 15, 2014.  Before sending Investor A this email, Sims and Procopio told Investor A that if he invested $140,000 in SIMS Equities they would guarantee him a return on his investment of up to $6 million.

38.   Sims told Investor A that the July 28, 2014 email was "extremely confidential" and he expected Investor A to keep the documents internal and not show them to anyone.  One of the documents Sims emailed to Investor A was a "Funding and Participation Agreement" between Sims, on behalf of SIMS Equities, and Investor A, on behalf of Investor A's company.

39.   In the agreement, SIMS Equities claimed to be a partner of HSBC Hong Kong Bank's "Trade Platform."  The agreement promised Investor A "weekly payments" of $150,000 for 40 weeks, if Investor A invested $140,000 as "a rider" on a $925 million trading platform.  Specifically, the agreement stated that if Investor A wired SIMS Equities $140,000 within 48 hours, Investor A would start receiving

weekly payments of $150,000 on August 19, 2014 and continue to receive them for 40 weeks, for a total profit of $6 million.

40.   The agreement contained what purported to be "transaction code" at the top and stated that Investor A's $140,000 investment would be "lodged" with the "paymaster" that SIMS Equities was using for its trade platform.  The agreement also provided that, if the trade failed to pay out by August 19, 2014, Investor A would have his full investment ($140,000) wired back to him within five banking days.

41.   Before Investor A signed the agreement, Sims and Procopio led Investor A to believe that his $140,000 would be pooled with other investors' money and that his investment was "guaranteed" and in a "no-lose situation."

42.   On July 29, 2014, in accordance with the terms of the agreement, Investor A wired approximately $140,000 to SIMS Equities' Chase Bank account ending in 8825, an account that had just $887.82 in it as of July 1, 2014.  The same day that Investor A wired the $140,000, Sims withdrew $78,000.  The following day, Sims purchased a $19,400 cashier's check in the name of a Southern California car dealership.  By July 31, 2014, the account had just $30,535.50 left in it and none of it had been wired to HSBC Hong Kong Bank.

43.   All of the representations Sims and Procopio made were false and misleading because the trading platforms Sims and Procopio claimed to have access to were completely made up and thus they had no ability to guarantee Investor A a return on his investment of up to $6 million.  In fact, Investor A has never received any of the payments he was promised under the agreement and, despite repeated demands, has never had any portion of his $140,000 investment refunded.

**2.   Investor B**

44.   On or about October 5, 2015, Sims, on behalf of SIMS Equities, entered into a "Funding and Participation Agreement" with Investor B.  The agreement contained what purported to be a "transaction code" at the top of the agreement and claimed that SIMS Equities was the "controller" of $1,000,000,000.  The agreement

promised Investor B he would receive an initial payment of $200,000 within 30 days plus weekly payments of $50,000 for 50 weeks (or $2,500,000), if he wired $100,000 to SIMS Equities.

45.     Before signing the agreement, Investor B met with Sims at Greaves' law office in San Diego, California.  Sims showed Investor B what appeared to be bank account statements and a pro forma explaining what would happen after Investor B invested.  These documents, which Investor B was not allowed to keep, made it appear to Investor B that SIMS Equities had large sums of money at the time Investor B invested and that more money was coming in.  Moreover, Greaves told Investor B that he had been involved in other dealings with Sims and Procopio and said they "had always come through," or words to that effect.

46.     On or about October 5, 2015, Investor B wired approximately $100,000 into Greaves' attorney trust account.  This was important to Investor B because it created a more transparent "paper trail" for the transaction.  That same day, on October 5, 2015, Greaves wrote Sims and Procopio separate checks for approximately $40,000 each.  The checks were written against the $100,000 that Investor B had deposited into Greaves' attorney trust account.  Sims deposited his $40,000 check into a SIMs Equities bank account that he controlled and Procopio deposited into a ALC bank account that he controlled.

47.     All of the representations Sims and Procopio made were false and misleading because Sims and Procopio were not the controllers of $1 billion as they had claimed and thus had no ability to pay Investor B a return of $2,500,000.  The documents that Sims showed Investor B during their meeting at Greaves' law office in San Diego, California were false and fictitious.  SIMS Equities did not have large sums of money at the time Investor B invested and more money was not coming in.  As of October 1, 2015, around the time Investor B invested, SIMS Equities had just $17.64 in its bank account.  In fact, Investor B has never received any of the payments he was promised under the agreement and, despite repeated demands, has

never had any portion of his initial investment of $100,000 refunded.

**3.  Investor C**

48.    On or about April 4, 2016, Procopio offered Investor C the opportunity to invest $1 million in what Procopio claimed was a "trade platform."  Procopio told Investor C that he had already raised $500 million from other investors and was scheduled to "trade" that money in the next several days using the trade platform. Procopio told Investor C that if he invested $1 million his money would be added to the $500 million and, in return, Investor C would receive 52 weekly payments of $1 million ($52 million).

49.    On or about April 5, 2016, Procopio, on behalf of ECE, entered into what purported to be a "Funding and Participation Agreement" with Investor C.  In the agreement, ECE claimed to be the client of HSBC Hong Kong Bank and the "Global—JD Trade Platform."  The agreement contained what purported to be a "transaction code" at the top and stated that ECE was the project funds manager of over "$1 billion."  It described the projects as "absolutely secured" and promised Investor C weekly payments of $1 million for 52 weeks, if he wired ECE $1 million.

50.    On or about April 6, 2016, Investor C instructed J.P. Morgan Bank to conduct an interbank ledger to ledger transfer of approximately $1 million from Investor C's bank to ECE's bank account.  Before Investor C made this investment, ECE's bank account had a balance of just $389.  By the end of April 2016, the withdrawals from ECE's bank account totaled $887,000, including a $500,000 cashier check, and yet there were no transfers to Hong Kong Bank, as Procopio led Investor C to believe there would be.

51.    All of the representations Sims and Procopio made were false and misleading because the trading platforms Sims and Procopio claimed to have access to were completely made up and thus they had no ability to guarantee Investor C a return on his investment of up to $50 million.  In fact, Investor C has never received any of the payments he was promised under the agreement and, despite repeated

demands, has never had any portion of his $1,000,000 investment refunded.

### 4.    The UC

52.    On or about February 3, 2017, Procopio, on behalf of ALC, entered into a "Funding and Participation Agreement" with UC.  The agreement contained what purported to be a "transaction code" at the top and stated that ALC was the "true client" of the Royal Bank of Canada and the project funds manager of over $1 billion. The agreement described the project as "absolutely secured" and promised UC he would receive an initial payment of $10,000 within 30 days plus monthly payments of $10,000 for 11 months, if he wired $10,000 to an attorney trust account owned by Greaves.

53.    Before signing the agreement, UC met with Sims and Procopio in-person and spoke with Greaves and Procopio over the telephone.  Unbeknownst to them, UC was actually an undercover agent working for the FBI.  Over the course of more than a year, UC secretly recorded the in-person meetings and telephone conversations he had with Sims, Procopio, and Greaves.

54.    For example, on February 8, 2016, UC spoke with Procopio over the telephone to discuss a document UC received from Procopio.  The document was a bank statement showing a deposit of approximately $1 million into a bank account on or about April 5, 2015.  Procopio said the deposit was evidence of his past performance for another client, where the client had invested $100,000 and 90 days later received a payment of $1 million.  Procopio described this as a "bullet trade" and told UC that if the document was not sufficient evidence of the trading platform's legitimacy he did not what else he could do.  The document Procopio gave UC was false and misleading.  In reality, the document was a bank statement for ECE, one of the defendant entities, and the $1 million Procopio claimed was a return was actually the initial investment B.B., the investor referenced above, made in ECE.

55.    On August 12, 2016, Procopio met with UC and told him that he had worked in trading for 10 years, but could not trade himself because he was paid

approximately $150,000 a year plus bonuses just to serve as a "gatekeeper." Procopio said he worked for two traders: Sims and Sims' business partner, "J.D." Procopio told UC that most of their clients invested $100 million cash in the trade platform and Procopio was offering UC the opportunity to "piggyback" on one of those trades. Procopio told UC there was absolutely no risk involved and said UC's money would only go through Greaves' attorney trust account.

56. Procopio told UC that Sims and his business partner would buy "medium-term bank notes" at a discounted price directly from central banks such as Deutsche Bank, HSBC Hong Kong, Credit Suisse, and Barclays and then sell those notes for a 20 to 30 percent profit. To back this up, Procopio showed UC what he called an "MT 103 wire transfer" indicating that Greaves had received $485 million into his account ending in 4182. Procopio told UC it was impossible for UC to lose money and said there would be 20 other people investing with UC. The statements Procopio made to UC were false and misleading. In reality, Greaves never received $485 million (or any money for that matter) from the trading platform and he never paid any returns to any investors from his attorney trust account.

57. On November 30, 2016, Procopio and Sims told UC they were in the middle of trading a billion dollars' worth of paper through the Royal Bank of Canada ("RBC"). They gave UC a letter purportedly written by Greaves indicating that Greaves had called the RBC on behalf of Sims and Procopio and verified through one of RBC's bank officers the presence of one-billion Euros in an account in the Grand Cayman Islands. The letter claimed that a minimum of $100 Million Euros would be available to ALC within 30 days and it could spend the money anyway it chose. Sims described Greaves as one of their "paymasters" and said he was licensed to bring vast sums of money, like $100 million, into the United States. The letter they gave UC was false and misleading. In reality, Greaves did not write the letter and Greaves never verified the presence of any money in an RBC account.

58. Sims told UC that the trading platforms started in 1944 at the Bretton

Woods convention at the end of World War II, as a way for European countries to rebuild Europe.  Sims said the convention enabled countries to print paper and sell it to traders like Sims.  Sims told UC that trading paper was a "well known secret" and the way wealthy people made their money.  This statement was false and misleading.  In reality, the trading platforms that Sims and Procopio described were fictitious and nothing more than a scam.

59.   On November 30, 2016, UC spoke with Greaves over the telephone about possibly investing with Sims and Procopio.  When UC asked Greaves if he had ever seen Sims and Procopio pay $4 million on a $1 million investment, Greaves said, "I've seen them pay that percentage before.  I've seen them do that.  I've seen them put $100,000 and pay four times that amount through my account."  Greaves also told UC, "When they do a transaction they usually have some money sent here so I can pay people off."  Greaves' statements to UC were false and misleading.  In reality, Greaves had never paid any principal or any returns to investors from his attorney trust account.

60.   UC showed Greaves the letter he had received from Sims and Procopio, which they claimed was written by Greaves.  Although Greaves knew, or was reckless for not knowing, that he did not write the letter and that the information in the letter about him verifying the existence of funds in an RBC account was completely false, Greaves led UC to believe he had, in fact, written the letter by merely walking back the statement about verifying the funds, saying he was not in a position to verify the funds as the letter indicated.

61.   On February 3, 2017, Procopio told UC that he could offer him one of three programs.  If UC invested $10,000, he would get $10,000 per month for 12 months (or a total of $120,000).  If UC invested $100,000, he would get $10,000 a week for 12 months (or a total of $520,000).  If UC invested $1 million, he would get $100,000 a week for 12 months (or a total of $5,200,000).  Procopio told UC he would start receiving the payments within 30 days and that he already had 16 other

investors signed up for the $10,000 per month program. Procopio told UC he would have to send his initial payment of $10,000 to Greaves and offered to have UC speak with Greaves over the telephone when he was ready to invest.

62. Procopio told UC that his money would only go to Greaves through his attorney trust account and then back to UC. He said it would never leave Greaves' account and once Greaves had proof that the funds were in his account, Greaves would simultaneously conduct the transaction and then use his account to pay UC his returns.

63. On February 10, 2017, in accordance with the terms of the agreement, UC wired approximately $10,000 to Greaves' attorney trust account ending in 7846. The same day, Greaves wrote a check for $10,000 to "Cash" and provided the check to Sims or Procopio. Sims or Procopio deposited the $10,000 ECE's account ending in 8127. None of the money UC invested was wired to RBC.

64. This was not the first time Greaves allowed his attorney trust account to be used by Sims and Procopio. Between September 2015 and February 2017, Greaves allowed investors to deposit approximately $120,000 into his attorney trust account, and then transferred the bulk of that money into bank accounts controlled by Sims and Procopio. As with the UC, Greaves accepted these investor deposits into his attorney trust account when he knew, or was reckless for not knowing, that Sims and Procopio had held him out as one of their "paymasters."

65. UC has never received any of the payments he was promised under the agreement and, despite repeated demands, has never had any portion of his $10,000 investment refunded.

66. These representations and omissions that Sims and Procopio made to investors, which Greaves aided and abetted, pertained to material facts that reasonable investors would have found important in making their investment decisions, particularly given Sim's prior history of being sued by the SEC for fraud and having a permanent injunction entered against him. Investors would have wanted

to know that their monies would not be invested in any trading platform; that they were not guaranteed to receive returns, let alone get back their principal; and that Sims and Procopio would not use investor monies as described, but would instead use them to pay their personal expenses.

67.   Sims, Procopio, and Greaves also never told investors that Sims had been sued by the SEC for fraud in 1997 for offering investors these same types of investments.  In that action, the SEC alleged that Sims had conducted a multi-million dollar fraudulent investment scheme involving—once again—fictional trading of securities purportedly issued by major international banks.  Without admitting or denying the allegations, Sims consented to the entry of judgment against him and was permanently enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5 in the future.

### 5.   Defendants' Roles in the Misrepresentations and Omissions

68.   As set forth above, Sims and Procopio knew, or were reckless in not knowing, that the representations they made to investors on behalf of the defendant entities regarding the investments were false and misleading.  These false and misleading representations included, among other things, the very existence of the trading platforms that were supposed to be the backbone of the investments, how the trading platforms were created, how the trading platforms operated, how investor money would be pooled together, how investor funds would be spent, how much of a return investors would receive on their investment, and how long it would take investors to see those returns.

69.   Because they are the principals of the defendant entities, Sims' and Procopio's scienter is imputed to the defendant entities that they controlled.

70.   At a minimum, Sims, Procopio and the defendant entities acted negligently and without reasonable care in the making these representations to investors about the trading platform and in generating the documents they gave to

investors about their investments.

71.    Greaves provided substantial assistance to Sims and Procopio in making these false and misleading statements, by making false and misleading statements to investors about the past performance of Sims and Procopio and by concealing material information about their past from investors.

**D.    Deceptive Conduct and Misappropriation**

72.    In addition to making these false and misleading statements, Sims and Procopio, acting on behalf of one or more of the defendant entities, also engaged in several deceptive acts in furtherance of a scheme to defraud investors.

**1.    Misappropriation and the Use of False Records**

73.    They generated, and caused others to generate, fictitious transaction codes, balance sheets, bank statements, and legal correspondence, all of which were designed to give investors the false impression that the trading platforms were a legitimate investment.

74.    Sims and Procopio also misappropriated all, or substantially all, of the investors' funds.  Of the estimated $1,410,000 they raised from approximately thirteen different investors, Sims and Procopio never invested any of the funds in trade platforms, which did not exist, and never paid any investors a return, with the exception of one Ponzi-like payment they made to an investor on April 7, 2016 in the amount of $65,000.

75.    Instead, Sims and Procopio spent the money they received from investors to pay for personal expenses incurred by Sims and Procopio such as cars, rent, jewelry, travel, golf, and food, and to make at least one Ponzi-like payment to another investor

76.    The following are examples of how Sims and Procopio spent investor money:

| Expenditure/Vendor | Date | Amount |
|---|---|---|
| Southern California Auto House Co. (car dealer) | July 30, 2014 | $19,400.00 |
| Apple Store, Costa Mesa, CA | August 1, 2014 | $1,359.92 |
| Roger Dunn Golf Shop, Santa Ana, CA | August 8, 2014 | $643.63 |
| Rent for Coronado Apartments (for April and May 2016) | April 7, 2016 | $4,271.71 |
| Jewelry Exchange, Tustin, CA | April 8, 2016 | $18,889.20 |
| American Airlines | April 11, 2016 | $6,262.12 |
| Mizumi Restaurant | April 12, 2016 | $852.00 |
| Hilton Trinidad Port of Spain | April 14, 2016 | $1,423.37 |
| 2016 Range Rover | April 16, 2016 | $75,000.00 |
| Sit N Sleep, Costa Mesa, CA | April 19, 2016 | $6,741.28 |
| Farmers Insurance | April 26, 2016 | $1,219.86 |

## 2.    Lulling Statements

77.    In addition, Sims and Procopio convinced investors into staying with their scheme with a series of lulling statements.

78.    Since the trading platform that Sims and Procopio claimed would be the backbone of the investments was nothing more than a scam and did not exist, numerous investors have not been repaid what they were promised.  This has led numerous investors to contact Sims, Procopio, and Greaves demanding explanations, the promised returns on their investments, and the return of their investments altogether.

79.    Sims, Procopio, and Greaves gave investors an array of excuses, both verbally and in writing, which they knew, or were reckless for not knowing, were false and misleading.  Some investors were even told by Sims and Procopio that the problems with their investments were caused by unexpected fees could be fixed if the investors sent them more money.

COMPLAINT                                    19

80.    For example, on May 24, 2016, approximately one month after Investor B invested in ECE, Procopio sent Investor B an email stating, "We have successfully procured $1 Billion into our accounts at Chase Bank—Hong Kong.  Those monies were ordered to be wired on this past Thursday, ordered to be sent into our Chase Bank - Newport Beach, CA.  I will have proof of that wire on Wednesday.  We expect the money to post to the Corp Chase bank account no later than Friday.  I will forward you the sanitized proof of swift mt103 wire transfer this Wednesday.  Please note, you have also been approved for [$2 Million] USD minimum."

81.    Sometime after sending this email, Procopio called Investor B and asked for $50,000.  Procopio told Investor A that the additional money was needed to pay "bank fees," which Procopio claimed were preventing the money Investor B was owed from entering the United States.  Procopio promised to pay Investor B an additional $500,000 to $1 million, if he sent the $50,000 in additional funds, but Investor B did not send this money.

82.    On March 29, 2017, when Investor C asked Procopio why he kept postponing sending Investor C his money, Procopio sent Investor C a text message saying, "I am postponing nothing, banks can only be pushed so fast!  Thank you for your patience and understanding as I am told money should start flowing weekly as of April 7th."

83.    In or about January 2018, when Investor C told Procopio that he had been subpoenaed by the SEC about his $1 million investment with Sims and Procopio through ECE, Procopio told Investor C that he would be paid shortly, but only if Investor C told the SEC that he did not make an investment in ECE but instead donated the $1 million to ECE.  Procopio even prepared a letter for Investor C to sign falsely stating, "With respect to the person, Mario Procopio … I made a donation to this corporation in early April 2016 for Charitable purposes."

84.    Investor C signed this letter knowing it was false but believing it would not be submitted to the SEC without his express permission and with the hope that it

would cause him to get his money back.  However, on January 18, 2018, Procopio sent this letter to the SEC from a Fed Ex store located in Costa Mesa, California and was captured on a video surveillance camera doing so.  Investor C still has not received any of the payments he was promised under his agreement and never had any portion of his money refunded.

85.     Similarly, in or about May 2017, approximately three years after Investor A invested in SIMS Equities and made repeated demands for payment, Procopio called Investor A and told him that he needed an additional $15,000 from Investor A in order to open a bank account and get Investor A his money.  Investor A sent Procopio the additional $15,000, but never received any of the payments he was promised under the agreement and never had any portion of his money refunded.

86.     Shortly after this happened, Procopio told Investor A that he needed an additional $1 million deposited into a bank account in order to get Investor A his money.  Investor A initially deposited the $1 million, but was notified by the bank that someone was attempting to borrow against those funds.  Investor A recovered the $1 million from the account before this could happen and has never received any of the payments he was promised under his original agreement or a refund of his initial investment.

### 3.    Defendants' Roles in the Fraudulent Conduct and Scheme

87.     Sims and Procopio knew, or were reckless in not knowing, that their conduct operated as a fraud on the investors because they misappropriated investor funds and generated, and caused others to generate, fictitious documents to make their claims about the trading platforms appear legitimate.  This deceptive conduct included, among other things, generating fictitious bank statements, fictitious transaction codes and funding agreements, fictitious "MT 103 wire transfers," and fictitious legal correspondence purportedly verifying the existence of funds.

88.     Sims and Procopio did not deposit any investor funds onto "prime bank trading platforms"—since there are no such thing—but rather, they diverted the

investor funds, from accounts under their exclusive control, for personal use, such as spending on cars, rent, jewelry, travel, golf, and food, and to make at least one Ponzi-like payment to another investor.

89.    As the principals of the defendant entities, the scienter of Sims and Procopio in carrying out their fraudulent scheme is imputed to the defendant entities that they controlled.

90.    At a minimum, Sims, Procopio and the defendant entities acted negligently and without reasonable care in the carrying out their fraudulent scheme.

91.    Greaves provided substantial assistance to Sims and Procopio in carrying out this fraudulent scheme.  Greaves helped them misappropriate the investor money and to lull the investors by allowing investors to deposit money into his attorney trust account and by transferring the bulk of that money to accounts Sims and Procopio controlled.  In addition, Greaves led UC to believe that a fictitious letter UC received from Sims and Procopio had been written by Greaves when, in fact, Greaves knew he did not write the letter and that the information in it was completely false.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Sims, Procopio, ALC, ECE, and SIMS Equities)**

92.    The SEC realleges and incorporates by reference paragraphs 1 through 91 above.

93.    Defendants Sims, Procopio, ALC, ECE, and SIMS Equities each defrauded investors by misappropriating investor funds and generating, and causing others to generate, fictitious balance sheets, bank statements, legal correspondence, and other documents to make their claims about the investments appear legitimate. They also made false and misleading statements to investors about the trading platforms and the overall nature of their investment.

94.    By engaging in the conduct described above, defendant Sims, Procopio,

ALC, ECE, and SIMS Equities, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

95.    By engaging in the conduct described above, defendant Sims, Procopio, ALC, ECE, and SIMS Equities violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendant Sims, Procopio, ALC, ECE, and SIMS Equities)

96.    The SEC realleges and incorporates by reference paragraphs 1 through 91 above.

97.    Defendants Sims, Procopio, ALC, ECE, and SIMS Equities each defrauded investors by misappropriating investor funds and generating, and causing others to generate, fictitious balance sheets, bank statements, legal correspondence, and other documents to make their claims about the investments appear legitimate. They also obtained money by means of false and misleading statements to investors about the trading platforms and the overall nature of their investment.

98.    By engaging in the conduct described above, defendant Sims, Procopio, ALC, ECE, and SIMS Equities, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or

communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; (b) with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

99.    By engaging in the conduct described above, defendant Sims, Procopio, ALC, ECE, and SIMS Equities violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Sections 17(a) of the Securities Act and
### Section 10(b) of the Exchange Act and Rule 10b-5
### (against Defendant Greaves)

100.   The SEC realleges and incorporates by reference paragraphs 1 through 91 above.

101.   Defendants Sims, Procopio, ALC, ECE, and SIMS Equities each defrauded investors by misappropriating investor funds and generating, and causing others to generate, fictitious balance sheets, bank statements, legal correspondence, and other documents to make their claims about the investments appear legitimate. They also made, or obtained money by means of, false and misleading statements to investors about the trading platforms and the overall nature of their investment.

102.   By reason of the conduct described above, defendant Sims, Procopio, ALC, ECE, and SIMS Equities violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

103.    Greaves knowingly and recklessly provided substantial assistance to, and thereby aided and abetted, Sims, Procopio, ALC, ECE, and SIMS Equities in these violations by accepting investor deposits into his attorney trust account when he knew, or was reckless for not knowing, that Sims and Procopio had been falsely holding Greaves out as their "paymaster" when, in fact, Greaves had never repaid any investors their principal or any returns on their investments through any of his accounts.  Greaves further aided and abetted Sims, Procopio, ALC, ECE, and SIMS Equities by making false and misleading statements to investors about the past performance of Sims and Procopio and by concealing material information about their past from investors.

104.    By reason of the conduct described above, defendant Greaves violated, and unless restrained and enjoined will continue to violate, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), and will continue to aid and abet his co-defendants in violating of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Sims, Procopio, ALC, ECE, and SIMS Equities, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the

Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Greaves, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating and from aiding and abetting a violation of  Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b),  and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## IV.

Order defendants Sims, Procopio, ALC, ECE, and SIMS Equities to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## V.

Order defendants Sims, Procopio, ALC, ECE, SIMS Equities, and Greaves to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  May 23, 2019

*/s/ Douglas M. Miller*
DOUGLAS M. MILLER
Attorney for Plaintiff
Securities and Exchange Commission